IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AGROPEX INTERNATIONAL, INC., | * | |
| Plaintiff, | * | |
| vs. | * | Civil Action No. ADC-19-1232 |
| ACCESS WORLD (USA) LLC, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

Defendant, Access World (USA) LLC ("Defendant"), moves this Court to dismiss Counts IV, V, and VI of the Amended Complaint of Plaintiff, Agropex International, Inc. ("Plaintiff"), for fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation, respectively (the "Motion to Dismiss") (ECF No. 33). After considering the Motion to Dismiss and the responses thereto (ECF Nos. 37, 41), the Court finds that no hearing is necessary. *See* Loc.R. 105.6 (D.Md. 2018). For the reasons stated herein, the Court DENIES Defendant's Motion to Dismiss.

### FACTUAL BACKGROUND

When reviewing a motion to dismiss, this Court accepts as true the facts alleged in the challenged complaint. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011). As part of its business operations, Plaintiff arranges for the import and export of bulk agricultural products, such as corn and soya. ECF No. 31 at 2, ¶ 4. In early 2017, Plaintiff entered a contract with Global Natural, LLC ("Global Natural") to sell corn and soya to downstream buyers after Plaintiff delivered the products to the United States. *Id.* at 3, ¶ 8. The contract between Plaintiff and Global Natural was for 21,000 metric tons of corn and 17,500 metric tons of soya (collectively the

"Cargo"). *Id.* at 2, ¶ 7. Global Natural entered a contract with Defendant to store the Cargo in Defendant's storage facility until Global Natural arranged the transport of the Cargo to buyers. *Id.* at 3, ¶ 9. In April 2017, when Plaintiff delivered the Cargo to Defendant's facility an independent entity, SGS, inspected the Cargo to ensure its quantity and quality; SGS confirmed that the entirety of the Cargo was in good condition upon delivery to Defendant's facility. *Id.* at 3, ¶¶ 10–11.

Disputes quickly arose regarding the storage fees and whether the Cargo was properly certified "organic," which led to the Cargo remaining in Defendant's storage facility. *Id.* at 3, ¶¶ 12–13. In a discussion about the storage fees, Global Natural's employee Michael Spangler informed Defendant employees Richard Jamison and Spencer Jamison that Plaintiff was the owner of the Cargo as early as April 7, 2017. *Id.* at 3, ¶ 12. Per industry standards, the Cargo needed to be stored so it would be free from moisture and identifiable for Plaintiff's future sales. *Id.* at 4, ¶¶ 14–15.

On July 11, 2017, Plaintiff's officer Darla Turner emailed Defendant's employee Jennifer Lewis to ask specifically about Defendant's storage methods for the Cargo. *Id.* at 4, ¶ 16. The same day, Ms. Turner also informed Defendant that Plaintiff had a buyer for the Cargo, and she requested the Cargo be available for Plaintiff to transport to the buyer. *Id.* at 4, ¶ 19. In a separate exchange on July 12, 2017, Defendant's counsel informed Plaintiff that Defendant would be responsible for any damage to the Cargo under Defendant's "care, custody, and control." *Id.* at 4, ¶ 18. After Plaintiff's request that Defendant make the product available for transport, Defendant refused to release the product because its storage agreement was with Global Natural, not with Plaintiff, and Global Natural would need to consent to the release. *Id.* at 5, ¶ 20. Although Defendant refused to release the Cargo to Plaintiff, Defendant still simultaneously demanded Plaintiff pay Global Natural's outstanding storage fees for the Cargo. *Id.* at 5, ¶ 21. On July 14,

2017, Defendant's counsel admitted to Plaintiff that Plaintiff had title to the Cargo, and still demanded Plaintiff pay all storage and handling costs. *Id.* at 5, ¶ 22.

On July 17, 2017, Ms. Turner notified Defendant's employee Simon Pollet that Plaintiff was in the process of securing a vessel to transport the Cargo to buyers. *Id.* at 6, ¶ 26. The same day, Mr. Pollet asked Ms. Turner to send him the specifications of the vessel Plaintiff was considering, and Ms. Turner immediately provided the information. *Id.* On July 18, 2017, Ms. Turner provided even more vessel specifications to Mr. Pollet, including its estimated arrival in Baltimore on July 21, 2017. *Id.* at 6, ¶ 27. Ms. Turner also informed Mr. Pollet that Plaintiff needed to confirm with the vessel that day. *Id.* The same day, Mr. Pollet replied to Ms. Turner's emails about the vessel requesting she sign a business confirmation document, indicating the vessel's specifications were acceptable, and informing Ms. Turner he would send her the outstanding storage invoices. *Id.* at 6, ¶ 28. At no point did Mr. Pollet inform Ms. Turner, or any other employee of Plaintiff's, the Cargo had been damaged while in storage. *Id.* Also on July 18, 2017, Mr. Pollet verbally informed Ms. Turner that Defendant would load the Cargo on the vessel at a rate of twenty dollars per metric ton at a pace of 3,000 metric tons per day. *Id.* at 6–7, ¶ 29. Mr. Pollet confirmed these were the stated amounts in an email on July 21, 2017, during which he informed Ms. Turner Defendant was increasing its rates. *Id.*

On July 20, 2017, Ms. Turner followed up via email with Mr. Pollet and Ms. Lewis regarding her July 11th questions concerning the Cargo's storage, to which no one had yet replied. *Id.* at 7, ¶ 34. On July 21, 2017, aware that Plaintiff's vessel was supposed to begin loading the Cargo that day, Mr. Pollet informed Ms. Turner that Defendant still had to weigh the Cargo, so the rates and pace he had quoted to her for loading the Cargo needed to be modified. *Id.* at 8, ¶ 36. Ms. Turner immediately responded questioning the additional fees. *Id.* Also on July 21, 2017,

Defendant's counsel told Global Natural's counsel that the Cargo belonged to Plaintiff, which had paid all outstanding and applicable fees, but Defendant still required that Plaintiff pay additional "loading fees." *Id.* at 7, ¶ 35. On July 24, 2017, Mr. Pollet informed Ms. Turner that Defendant was increasing its loading rate to thirty-six dollars per metric ton and decreasing its loading pace to 1,900 metric tons per day. *Id.* at 8, ¶ 37. Because Plaintiff had already secured a buyer and a vessel for the Cargo, it was forced to pay Defendant's new rates; Plaintiff was also subject to a $345,951.04 fee from the vessel for the delay. *Id.* at 8, ¶¶ 38–39. Also on July 24, 2017, Ms. Lewis partially responded to Ms. Turner's July 11th and 20th emails by stating only the Cargo was stored outside. *Id.* at 8, ¶ 40.

On July 25, 2017, Ms. Turner informed Mr. Pollet and Defendant's employee Len Crescenzo via email that the United States Department of Agriculture ("USDA") found that one pile of corn that was part of the Cargo was damaged, and the USDA would be performing inspections the next day. *Id.* at 8, ¶ 41. Ms. Turner also informed Mr. Pollet and Mr. Crescenzo that the vessel would not dock to be loaded until the USDA reported on the quality of the Cargo. *Id.* After this discovery, on July 27, 2017, Mr. Pollet responded to Ms. Turner's July 11th email by providing more information on Defendant's storage system. *Id.* at 8–9, ¶ 42. Mr. Pollet stated that Defendant had an aeration system, but Defendant "d[id] not check quality, quantity, temperature, humidity, or for infestation." *Id.* In the same email, Mr. Pollet also sought to disclaim Defendant's previous assurances that it was responsible for any damage to the Cargo while it was stored in Defendant's facility. *Id.* at 9, ¶ 43.

On August 4, 2017, Plaintiff sent Defendant a formal protest letter signed by Ms. Turner asking Defendant to accept liability for the damage to the Cargo. *Id.* at 9, ¶ 45. Plaintiff's letter detailed the substandard conditions to which Defendant subjected the Cargo as well as Defendant's

4

deficiencies compared to the expected loading pace. *Id.* On August 17, 2017, Defendant sent Plaintiff a letter signed by Mr. Pollet refusing to accept responsibility, and alleging Global Natural was an agent for Plaintiff as opposed to an intermediary. *Id.* at 9, ¶ 46. Defendant's letter also admitted for the first time that the Cargo had been stored for five months in a system only intended to be used for thirty days. *Id.*

Separately on August 17, 2017, Mr. Crescenzo emailed Ms. Turner inquiring as to Plaintiff's plans for the damaged Cargo. *Id.* at 10, ¶ 50. Ms. Turner responded on August 18, 2017, that Plaintiff would keep Defendant updated on its plans for the Cargo, and Ms. Turner requested that Mr. Crescenzo confirm that the Cargo was being protected from further harm. *Id.* at 10, ¶ 51. On August 21, 2017, after receiving no response, Ms. Turner again emailed Mr. Crescenzo to inquire as to how the damaged Cargo was being protected and to request that Defendant advise her of the extent of the damage to the corn. *Id.* at 10, ¶ 52. Mr. Crescenzo responded that the damaged Cargo would be stored in bins covered by a tarp, but there would be no aeration system. *Id.* On August 22, 2017, Ms. Turner informed Mr. Crescenzo that her calculation indicated Defendant was still storing 4,000 metric tons of damaged corn. *Id.* at 11, ¶ 53. On August 23, 2017, Ms. Turner responded to Mr. Crescenzo's email that the damaged Cargo was not being aerated by stating the Cargo must be stored in a way to prevent future damage and by stating the newly discovered damaged Cargo must also be protected. *Id.* at 11, ¶ 54. On August 28, 2017, Mr. Crescenzo told Plaintiff the damaged Cargo "was separated and protected." *Id.* at 11, ¶ 55. Based on Mr. Crescenzo's statement, Plaintiff arranged to sell the damaged Cargo to a buyer. *Id.* at 11, ¶ 56.

On November 2, 2017, Ms. Turner emailed Mr. Crescenzo and Defendant's employee Adam Malinski requesting they confirm the amount of Cargo was correct on a spreadsheet she

5

obtained from Defendant's employee Katlyn Ruble. *Id.* at 11, ¶ 57. The spreadsheet stated Defendant was storing 4,390 metric tons of soya and 1,891 metric tons of corn for Plaintiff, which Mr. Malinski confirmed. *Id.* at 11, ¶¶ 58–59. On November 2, 2017, Plaintiff arranged for the sale of 3,900 metric tons of the damaged soya significantly less than the standard market price for good soya. *Id.* at 11, ¶¶ 60–61. On November 6, 2017, Ms. Turner emailed Mr. Crescenzo and Mr. Malinski requesting that Defendant screen 3,300 metric tons of soya being loaded from a specific bin, which Mr. Malinski replied was unnecessary. *Id.* at 12, ¶¶ 63–64. Because Defendant had said screening was unnecessary, Plaintiff sold the soya to a buyer without screening; the buyer refused delivery, and it was only then that Plaintiff learned the Cargo was "substantially more damaged" than Defendant had represented and contained debris. *Id.* at 12, ¶ 65. Plaintiff had to refund a portion of the purchase price to the buyer, and its reputation with the buyer was damaged. *Id.* at 12, ¶ 66. Plaintiff was unaware of the full extent of the damage to the Cargo before the buyer refused delivery, and Defendant did not inform Plaintiff of the damage. *Id.* at 13–14, ¶¶ 75–76.

Plaintiff lost revenue as a result of the damage to the Cargo, and over 1,800 metric tons of Plaintiff's corn was never recovered from Defendant's facility. *Id.* at 12, ¶ 67. Furthermore, almost 375 metric tons of Plaintiff's corn was so damaged it needed to be destroyed. *Id.* at 12, ¶ 68. From June 2017 through February 2018, Defendant charged Plaintiff approximately $1,987,163.48 for storage, handling, loading/unloading, and overtime without considering the damage to the Cargo. *Id.* at 13, ¶ 74. On August 24, 2018, Defendant charged Plaintiff for storage and disposal fees for the remaining damaged Cargo that Plaintiff was unaware Defendant still retained. *Id.* at 14–15, ¶¶ 78, 80, 85. Plaintiff's financial losses are attributable to lost revenue, storage and related fees, vessel demurrage fees, and refunds to buyers; by Plaintiff's calculations, these losses total $4,152,654.20. *Id.* at 17, ¶ 96.

## PROCEDURAL BACKGROUND

On April 26, 2019, Plaintiff filed this lawsuit against Defendant, seeking compensatory and punitive damages exceeding $3,500,000 (ECF No. 1).[1] On June 7, 2019, Defendants filed a motion to dismiss for failure to state a claim as to all but Count I of the Complaint (ECF No. 19). On June 21, 2019, Plaintiff filed a response in opposition (ECF No. 20), to which Defendant replied on July 5, 2019 (ECF No. 21). On July 23, 2019, this Court entered a Memorandum Opinion and Order granting in part and denying in part Defendant's Motion to Dismiss with leave for Plaintiff to amend (ECF Nos. 23, 24).

On August 22, 2019, Plaintiff filed an Amended Complaint (ECF No. 31). On September 5, 2019, Defendants filed a Motion to Dismiss Counts IV, V, and VI of the Amended Complaint (ECF No. 33) and an Answer to the remaining Counts (ECF No. 34). On September 19, 2019, Plaintiff opposed the Motion to Dismiss (ECF No. 37), and on October 17, 2019, Defendant filed a reply (ECF No. 41). Accordingly, the Motion to Dismiss is fully briefed.

## DISCUSSION

Defendant argues that Plaintiff's fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation allegations fail to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). ECF No. 33 at 1. More specifically, Defendant argues that Plaintiff's fraudulent misrepresentation and concealment claims have not met the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b), and that Plaintiff fails to allege an independent tort duty to support its fraudulent concealment and negligent misrepresentation claims.

---

[1] On April 26, 2019, in accordance with Standing Order 2019-07 of the United States District Court for the District of Maryland and upon consent of all parties, this case was directly assigned to United States Magistrate Judge J. Mark Coulson for all proceedings. ECF No. 3. This case was later transferred to United States Magistrate Judge A. David Copperthite.

7

## A. Standard of Review for Motion to Dismiss for Failure to State a Claim

The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. As stated in *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (internal citations omitted). Although when considering a motion to dismiss a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

## B. Defendants' Motion to Dismiss

In its Motion, Defendant seeks to dismiss three of Plaintiff's claims. The Court will address each disputed Count.

### *1. Plaintiff alleges sufficient facts to meet the Rule 9(b) heightened pleading standard.*

In Counts IV and V, Plaintiff alleges that Defendant engaged in fraudulent misrepresentation and fraudulent concealment; both Counts are subject to the heightened pleading

8

standard for fraud claims under Federal Rule of Civil Procedure 9(b). Defendant argues cursorily that Plaintiff does not meet the Rule 9(b) pleading standard, and then further argues that "Plaintiff still fails to allege any such misrepresentation concerning the *condition* of the Cargo." ECF Nos. 33 at 1, 33-1 at 5. The Court disagrees.

In Maryland, "[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement." *Sass v. Andrew*, 152 Md.App. 406, 432 (2003) (quoting *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 529 (8th Cir. 1999)). Under Rule 9, when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED.R.CIV.P. 9(b). This Court has interpreted Rule 9(b) as requiring a plaintiff to "'at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Kantsevoy v. LumenR LLC*, 301 F.Supp.3d 577, 600 (D.Md. 2018) (quoting *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010)).

While this is a high pleading bar, "[n]otably . . . Rule 9(b) by its plain text permits general averment of aspects of fraud that relate to a defendant's state of mind." *Id.* at 601. Therefore, the "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). "Moreover, Rule 9(b) is 'less strictly applied with respect to claims of fraud by concealment' or omission of material facts, as opposed to affirmative misrepresentations, because 'an omission

9

cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.""" *Id.* (quoting *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F.Supp. 539, 552 (D.Md. 1997)).

Plaintiff makes two claims that are subject to the Rule 9(b) pleading standard: fraudulent misrepresentation and fraudulent concealment. In Maryland, to sustain a claim for fraudulent misrepresentation, a Plaintiff must allege:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Avery v. Chariots for Hire*, 748 F.Supp.2d 492, 504 (D.Md. 2010) (quoting *Alleco Inc. v. Harry & Jeannete Weinberg Found., Inc.*, 340 Md. 176, 195 (1995)). In Maryland, to sustain a claim for fraudulent concealment, a Plaintiff must allege:

> (1) that the defendant owed a duty to the plaintiff to disclose a material fact; (2) that the defendant failed to disclose that fact; (3) that the defendant intended to defraud or deceive the plaintiff; (4) that the plaintiff took action in justifiable reliance on the concealment; and (5) that the plaintiff suffered damages as a result of the defendant's concealment.

*Hill v. Brush Engineered Materials, Inc.*, 383 F.Supp.2d 814, 820 (quoting *Deckelbaum v. Cooter, Mangold, Tompert & Chapman, P.L.L.C.*, 292 B.R. 536, 540 (D.Md. 2003)).[2]

While Plaintiff's original Complaint may have only made surface-level allegations of fraudulent activity, its Amended Complaint has substantially bolstered the alleged facts. Throughout the Amended Complaint, Plaintiff alleges specific instances of communication with Defendant's employees, always including the date, speaker, and method of communication as well

---

[2] The Court addresses the duty element of a fraudulent concealment claim *infra*, Part B.2.

as the substance of the communication. Plaintiff also consistently alleges that these communications with Defendant's various employees served the purpose of Defendant continuing to charge and collect fees from Plaintiff. Under Rule 9(b), Plaintiff is required to allege "'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby,'" *Kantsevoy*, 301 F.Supp.3d at 600 (quoting *First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d at 731), and Plaintiff here has done so. Furthermore, the Court is satisfied (1) "that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial," and (2) "that plaintiff has substantial prediscovery evidence of those facts" because the majority of the representations took place over email. *Id.* (quoting *Harrison*, 176 F.3d at 784). Accordingly, Plaintiff has met the Rule 9(b) pleading standard for fraud claims.

Regarding Defendant's argument that Plaintiff did not allege Defendant misrepresented the condition of the Cargo and so its claims must fail, the Court notes Defendant read Plaintiff's Amended Complaint too narrowly. Plaintiff alleges Defendant explicitly misrepresented at least: the loading rates and pace, ECF No. 31 at 6, ¶ 29; the necessity of screening the product, *id.* at 12, ¶ 64; the extent of the damage to the Cargo, *id.* at 12, ¶ 65; and the amount of Cargo remaining at Defendant's facility, *id.* at 12, 14, ¶¶ 67, 78–79. Plaintiff alleges Defendant improperly concealed at least: the initial damage to the Cargo, *id.* at 7–9, ¶¶ 31, 40, 42; the storage conditions under which the Cargo was kept, *id.* at 7–8, ¶¶ 34, 40; and the fact that Defendant retained some of the Cargo months after Plaintiff thought it had been destroyed, *id.* at 14, ¶ 79. Plaintiff alleges that all these misrepresentations and concealments were made with the intent of continuing to charge Plaintiff for the storage and maintenance of the Cargo and alleges that it justifiably relied on all these misrepresentations and concealments to its detriment, resulting in substantial monetary

damages. Because Plaintiff has sufficiently alleged multiple instances of both fraudulent misrepresentation and concealment, these claims will be allowed to proceed.

*2. Plaintiff sufficiently alleges Defendant owed it an independent tort duty.*

In Counts V and VI, Plaintiff alleges that Defendant engaged in fraudulent concealment and negligent misrepresentation; both Counts require that a defendant owes a tort duty to a plaintiff. Defendant argues that Plaintiff has not alleged that Defendant owed Plaintiff a tort duty independent of its contractual duties. In fact, Defendant states that in bringing these claims Plaintiff "attempt[s] to misdirect the Court" from the contractual nature of this suit. ECF No. 33-1 at 2. Defendant, however, cites partial sentences from this Court's prior opinion addressing the original Complaint out of context in a misguided attempt to convince the Court it made previous binding holdings it, in fact, did not. ECF No. 33-1 at 3, 4, 7, 11; ECF No. 41 at 1, 2, 3, 6. This Court held that under the allegations in the original Complaint, Plaintiff had not alleged a duty in tort sufficiently separate from its breach of contract claim; that holding said nothing about the Amended Complaint—which greatly supplements Plaintiff's factual allegations—at issue now. Allowing a plaintiff to amend a factually deficient complaint to supplement enough facts to sustain the plaintiff's original claims is the entire point of a court dismissing a count without prejudice. Accordingly, the Court disagrees with Defendant. The Court also disagrees with Defendant that Plaintiff has not alleged a sufficiently separate tort duty existed.

The elements of a fraudulent concealment claim are enumerated above. In Maryland, to sustain a claim for negligent misrepresentation, the Plaintiff must allege:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that [its] statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Dowling v. A.R.T. Institute of Washington, Inc.*, 372 F.Supp.3d 274, 294 (D.Md. 2019) (citing *Vill. of Cross Keyes, Inc. v. U.S. Gypsum Co.*, 315 Md. 741, 755–56 (1989)). To determine whether a tort duty exists, courts examine: "(1) 'the nature of the harm likely to result from a failure to exercise due care,' and (2) 'the relationship that exists between the parties.'" *Balfour Beatty Infrastructure v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 611 (2017) (quoting *100 Inv. Ltd. P'ship v. Gen. Motors Corp.*, 397 Md. 108, 128–29 (2007)).

Here, Plaintiff only alleges economic damages and, therefore, triggers the economic loss rule. The economic loss rule "represents a judicial refusal to extend tort liability to negligence that causes purely economic harm in the absence of privity, physical injury, or risk of physical injury." *Id.* In cases that only allege economic harm, Maryland courts "have generally required an intimate nexus between the parties as a condition to the imposition of tort liability." *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534 (1986). The intimate nexus examination "requires the relationship between the parties be sufficiently close—or intimate—to support finding a tort duty. In these cases, if an intimate nexus was established, a duty of care was owed, and the defendant could be held liable to the plaintiff for pecuniary losses." *Balfour Beatty*, 451 Md. at 615 (citing *Jacques*, 307 Md. at 534–35). "This intimate nexus is satisfied by contractual privity or its equivalent." *Jacques*, 307 Md. at 534–35. The "privity-equivalent analysis in economic loss cases looks for linking conduct—enough to show the defendant knew or should have known of the plaintiff's reliance." *Balfour Beatty*, 451 Md. at 620.

In determining when a plaintiff meets the intimate nexus test, the Maryland Court of Appeals in *Jacques v. First National Bank of Maryland* relied in part on a New York Court of Appeals decision by then-Judge Benjamin Cardozo, *Glanzer v. Shepard*, 233 N.Y. 236 (1922). *Jacques*, 307 Md. at 535–36. The *Glanzer* case involved the sale of bags of beans that were

measured and sold by weight. *Glanzer*, 233 N.Y. at 238. The bean seller contracted with an independent weighing company to weigh the beans for sale to a buyer. *Id.* The weigher incorrectly weighed the beans, and, as a direct result, the buyer overpaid for the bags of beans it purchased. *Id.* The New York Court of Appeals held that the buyer was able to bring an action against the weigher because it found "the law imposes a duty toward buyer as well as seller" in that case. *Id.* Although the buyer and weigher did not have a contract between them, the weigher's contract with the seller was for the ultimate benefit of the buyer, and the weigher therefore owed the buyer a duty to perform its task correctly. *Id.* at 241–42.

In the negligent misrepresentation context, the Maryland Court of Appeals in *Balfour Beatty* discussed its previous opinion in *Village of Cross Keys, Inc. v. U.S. Gypsum Co.* to highlight when a tort duty can be imposed when only economic loss is alleged. *Balfour Beatty*, 451 Md. at 627–29. The *Balfour Beatty* court emphasized the fact that in its instant case, the parties were governed by a variety of contracts among themselves, while in *Village of Cross Keys*, the parties were not bound by contracts. *Id.* at 629. The *Village of Cross Keys* plaintiffs "had no opportunity to negotiate a contract with the [defendant] regarding the cost or remedies. There was no competitive bidding process or contract governing liability." *Id.* The court in *Balfour Beatty* used the fact that its parties had contracts they negotiated binding them as justification for declining to impose a tort duty on the defendant. *Id.*

In the fraudulent concealment context, in Maryland, "a duty to disclose can arise either 'when one party is in a fiduciary or confidential relationship with the other,' or 'when one party makes a partial and fragmentary statement of fact.'" *Hill*, 383 F.Supp.2d at 820 (quoting *Estate of White ex rel. White v. R.J. Reynolds Tobacco Co.*, 109 F.Supp.2d 424, 431 (D.Md. 2000)). While silence by itself does not constitute fraud,

14

where "in addition to a party's silence, there is any statement, word or act on [its] part, which tends affirmatively to the suppression of the truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts," [the defendant] may be liable for fraudulent concealment.

*Id.* (quoting *Lubore v. RPM Associates, Inc.*, 109 Md.App. 312, 330 (1996)).

By examining *Glanzer*, *Balfour Beatty*, and *Hill*, the Court finds that Plaintiff has sufficiently alleged Defendant owed it a tort duty to sustain its fraudulent concealment and negligent misrepresentation claims. Notably, Plaintiff and Defendant each had separate contracts with Global Natural, but never had an opportunity to negotiate contracts with each other. This important fact makes this case analogous to *Glanzer*, because Plaintiff was the ultimate beneficiary of the contract between Defendant and Global Natural, though it did not negotiate a contract with Defendant itself. *See Glanzer*, 233 N.Y. at 241–42; *Balfour Beatty*, 451 Md. at 629. Furthermore, regarding Plaintiff's fraudulent concealment claim, Plaintiff alleges a litany of partial disclosures by Defendant designed to cause "'suppression of the truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts.'" *Hill*, 383 F.Supp.2d at 431 (quoting *Lubore*, 109 Md.App. at 330); *see e.g.* ECF No. 31 at 8, ¶ 40 ("Lewis responded to Turner's July 20th email stating that the product was stored outside. She provided no other information in the email."); *id.* at 9, ¶ 44 ("At no time did [Defendant] state that the storage of the product was temporary or only suitable for short-term storage."); *id.* at 12, ¶ 66 (Defendant "misrepresented that the produce would not need to be screened and was in far worse condition than [Defendant] had represented"). Accordingly, Plaintiff sufficiently demonstrates an intimate nexus between it and Defendant to overcome the economic loss rule.

Because Plaintiff has met the Rule 9(b) pleading standard for its claims based in fraud, and because Plaintiff has sufficiently alleged Defendant owed it a tort duty independent from its contractual duties, Plaintiff's fraudulent misrepresentation, fraudulent concealment, and negligent

15

misrepresentation claims will be allowed to proceed. Accordingly, Defendant's Motion to Dismiss is DENIED.

## CONCLUSION

In conclusion, for the reasons stated herein, Defendants' Motion to Dismiss (ECF No. 33) is DENIED. A separate order will follow.

Date: 21 November 2019

A. David Copperthite
United States Magistrate Judge