IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| AGROPEX INTERNATIONAL, INC., | * |
| --- | --- |
| Plaintiff, | * |
| vs. | * Civil Action No. ADC-19-1232 |
| ACCESS WORLD (USA) LLC, | * |
| Defendant. | * |

## MEMORANDUM OPINION

Defendant Access World (USA) LLC, ("Defendant") moves this Court for summary judgment (the "Motion"). ECF No. 94. Defendant seeks a ruling in its favor against all counts in the Amended Complaint brought by Plaintiff Agropex International, Inc., ("Plaintiff"). ECF No. 31. Defendant also filed a Counterclaim (ECF No. 34) attached to its Answer and Affirmative Defenses, in response to the allegations contained in Counts I, II, and III of Plaintiff's Amended Complaint, alleging Plaintiff's breach of contract, unjust enrichment, and monies owed to Defendant for services rendered. ECF No. 34. Plaintiff included a Cross-Motion for summary judgment in its Response in Opposition to Defendant's Motion. ECF No. 100. After considering the Motions and responses thereto (ECF Nos. 34, 94, 100, 101, 103) the Court finds that no hearing is necessary. Loc.R.105.6 (D.Md. 2018). For the reasons stated herein, the Court DENIES Defendant's Motion for Summary Judgment. ECF No. 94. The Court also DENIES Plaintiff's Cross-Motion for Summary Judgment. ECF No. 100-1.

1

## FACTUAL BACKGROUND

This suit arises out of the handling and storage of an international shipment of corn and soya product. ECF No. 31 at 3 ¶ 6. As part of its business operations, Plaintiff arranges for the import and export of bulk agricultural products, such as corn and soya. ECF No. 31 at 2, ¶ 4. In early 2017, Plaintiff entered a contract with Global Natural, LLC ("Global Natural") to sell corn and soya to downstream buyers after Plaintiff delivered the products to the United States. *Id.* at 3, ¶ 8. The contract between Plaintiff and Global Natural was for 21,000 metric tons of corn and 17,500 metric tons of soya (collectively the "Cargo"). *Id.* at 2, ¶ 7. Global Natural entered a contract with Defendant to store the Cargo in Defendant's storage facility until Global Natural arranged the transport of the Cargo to buyers. *Id.* at 3, ¶ 9. In April 2017, when Plaintiff delivered the Cargo to Defendant's facility an independent entity, SGS, inspected the Cargo to ensure its quantity and quality; SGS confirmed that the entirety of the Cargo was in good condition upon delivery to Defendant's facility. *Id.* at 3, ¶¶ 10–11.

Disputes quickly arose regarding the storage fees and whether the Cargo was properly certified "organic," which led to the Cargo remaining in Defendant's storage facility. *Id.* at 3, ¶¶ 12–13. In a discussion about the storage fees, Global Natural's employee Michael Spangler informed Defendant employees Richard Jamison and Spencer Jamison that Plaintiff was the owner of the Cargo as early as April 7, 2017. *Id.* at 3, ¶ 12. Per industry standards, the Cargo needed to be stored so it would be free from moisture and identifiable for Plaintiff's future sales. *Id.* at 4, ¶¶ 14–15.

On July 11, 2017, Plaintiff's officer Darla Turner emailed Defendant's employee Jennifer Lewis to ask specifically about Defendant's storage methods for the Cargo. *Id.* at 4, ¶ 16. The same day, Ms. Turner also informed Defendant that Plaintiff had a buyer for the Cargo, and she

2

requested the Cargo be available for Plaintiff to transport to the buyer. *Id.* at 4, ¶ 19. In a separate exchange on July 12, 2017, Defendant's counsel informed Plaintiff that Defendant would be responsible for any damage to the Cargo under Defendant's "care, custody, and control." *Id.* at 4, ¶ 18. After Plaintiff's request that Defendant make the product available for transport, Defendant refused to release the product because its storage agreement was with Global Natural, not with Plaintiff, and Global Natural would need to consent to the release. *Id.* at 5, ¶ 20. Although Defendant refused to release the Cargo to Plaintiff, Defendant still simultaneously demanded Plaintiff pay Global Natural's outstanding storage fees for the Cargo. *Id.* at 5, ¶ 21. On July 14, 2017, Defendant's counsel admitted to Plaintiff that Plaintiff had title to the Cargo, and still demanded Plaintiff pay all storage and handling costs. *Id.* at 5, ¶ 22.

On July 17, 2017, Ms. Turner notified Defendant's employee Simon Pollet that Plaintiff was in the process of securing a vessel to transport the Cargo to buyers. *Id.* at 6, ¶ 26. The same day, Mr. Pollet asked Ms. Turner to send him the specifications of the vessel Plaintiff was considering, and Ms. Turner immediately provided the information. *Id.* On July 18, 2017, Ms. Turner provided even more vessel specifications to Mr. Pollet, including its estimated arrival in Baltimore on July 21, 2017. *Id.* at 6, ¶ 27. Ms. Turner also informed Mr. Pollet that Plaintiff needed to confirm with the vessel that day. *Id.* The same day, Mr. Pollet replied to Ms. Turner's emails about the vessel requesting she sign a business confirmation document, indicating the vessel's specifications were acceptable, and informing Ms. Turner he would send her the outstanding storage invoices. *Id.* at 6, ¶ 28. At no point did Mr. Pollet inform Ms. Turner, or any other employee of Plaintiff's, the Cargo had been damaged while in storage. *Id.* Also on July 18, 2017, Mr. Pollet verbally informed Ms. Turner that Defendant would load the Cargo on the vessel at a rate of twenty dollars per metric ton at a pace of 3,000 metric tons per day. *Id.* at 6–7, ¶ 29.

3

Mr. Pollet confirmed these were the stated amounts in an email on July 21, 2017, during which he informed Ms. Turner Defendant was increasing its rates. *Id.*

On July 20, 2017, Ms. Turner followed up via email with Mr. Pollet and Ms. Lewis regarding her July 11th questions concerning the Cargo's storage, to which no one had yet replied. *Id.* at 7, ¶ 34. On July 21, 2017, aware that Plaintiff's vessel was supposed to begin loading the Cargo that day, Mr. Pollet informed Ms. Turner that Defendant still had to weigh the Cargo, so the rates and pace he had quoted to her for loading the Cargo needed to be modified. *Id.* at 8, ¶ 36. Ms. Turner immediately responded questioning the additional fees. *Id.* Also on July 21, 2017, Defendant's counsel told Global Natural's counsel that the Cargo belonged to Plaintiff, which had paid all outstanding and applicable fees, but Defendant still required that Plaintiff pay additional "loading fees." *Id.* at 7, ¶ 35. On July 24, 2017, Mr. Pollet informed Ms. Turner that Defendant was increasing its loading rate to thirty-six dollars per metric ton and decreasing its loading pace to 1,900 metric tons per day. *Id.* at 8, ¶ 37. Because Plaintiff had already secured a buyer and a vessel for the Cargo, it was forced to pay Defendant's new rates; Plaintiff was also subject to a $345,951.04 fee from the vessel for the delay. *Id.* at 8, ¶¶ 38–39. Also on July 24, 2017, Ms. Lewis partially responded to Ms. Turner's July 11th and 20th emails by stating only the Cargo was stored outside. *Id.* at 8, ¶ 40.

On July 25, 2017, Ms. Turner informed Mr. Pollet and Defendant's employee Len Crescenzo via email that the United States Department of Agriculture ("USDA") found that one pile of corn that was part of the Cargo was damaged, and the USDA would be performing inspections the next day. *Id.* at 8, ¶ 41. Ms. Turner also informed Mr. Pollet and Mr. Crescenzo that the vessel would not dock to be loaded until the USDA reported on the quality of the Cargo. *Id.* After this discovery, on July 27, 2017, Mr. Pollet responded to Ms. Turner's July 11th email

4

by providing more information on Defendant's storage system. *Id.* at 8–9, ¶ 42. Mr. Pollet stated that Defendant had an aeration system, but Defendant "d[id] not check quality, quantity, temperature, humidity, or for infestation." *Id.* In the same email, Mr. Pollet also sought to disclaim Defendant's previous assurances that it was responsible for any damage to the Cargo while it was stored in Defendant's facility. *Id.* at 9, ¶ 43.

On August 4, 2017, Plaintiff sent Defendant a formal protest letter signed by Ms. Turner asking Defendant to accept liability for the damage to the Cargo. *Id.* at 9, ¶ 45. Plaintiff's letter detailed the substandard conditions to which Defendant subjected the Cargo as well as Defendant's deficiencies compared to the expected loading pace. *Id.* On August 17, 2017, Defendant sent Plaintiff a letter signed by Mr. Pollet refusing to accept responsibility, and alleging Global Natural was an agent for Plaintiff as opposed to an intermediary. *Id.* at 9, ¶ 46. Defendant's letter also admitted for the first time that the Cargo had been stored for five months in a system only intended to be used for thirty days. *Id.*

Separately on August 17, 2017, Mr. Crescenzo emailed Ms. Turner inquiring as to Plaintiff's plans for the damaged Cargo. *Id.* at 10, ¶ 50. Ms. Turner responded on August 18, 2017, that Plaintiff would keep Defendant updated on its plans for the Cargo, and Ms. Turner requested that Mr. Crescenzo confirm that the Cargo was being protected from further harm. *Id.* at 10, ¶ 51. On August 21, 2017, after receiving no response, Ms. Turner again emailed Mr. Crescenzo to inquire as to how the damaged Cargo was being protected and to request that Defendant advise her of the extent of the damage to the corn. *Id.* at 10, ¶ 52. Mr. Crescenzo responded that the damaged Cargo would be stored in bins covered by a tarp, but there would be no aeration system. *Id.* On August 22, 2017, Ms. Turner informed Mr. Crescenzo that her calculation indicated Defendant was still storing 4,000 metric tons of damaged corn. *Id.* at 11, ¶

53. On August 23, 2017, Ms. Turner responded to Mr. Crescenzo's email that the damaged Cargo was not being aerated by stating the Cargo must be stored in a way to prevent future damage and by stating the newly discovered damaged Cargo must also be protected. *Id.* at 11, ¶ 54. On August 28, 2017, Mr. Crescenzo told Plaintiff the damaged Cargo "was separated and protected." *Id.* at 11, ¶ 55. Based on Mr. Crescenzo's statement, Plaintiff arranged to sell the damaged Cargo to a buyer. *Id.* at 11, ¶ 56.

On November 2, 2017, Ms. Turner emailed Mr. Crescenzo and Defendant's employee Adam Malinski requesting they confirm the amount of Cargo was correct on a spreadsheet she obtained from Defendant's employee Katlyn Ruble. *Id.* at 11, ¶ 57. The spreadsheet stated Defendant was storing 4,390 metric tons of soya and 1,891 metric tons of corn for Plaintiff, which Mr. Malinski confirmed. *Id.* at 11, ¶¶ 58–59. On November 2, 2017, Plaintiff arranged for the sale of 3,900 metric tons of the damaged soya significantly less than the standard market price for good soya. *Id.* at 11, ¶¶ 60–61. On November 6, 2017, Ms. Turner emailed Mr. Crescenzo and Mr. Malinski requesting that Defendant screen 3,300 metric tons of soya being loaded from a specific bin, which Mr. Malinski replied was unnecessary. *Id.* at 12, ¶¶ 63–64. Because Defendant had said screening was unnecessary, Plaintiff sold the soya to a buyer without screening; the buyer refused delivery, and it was only then that Plaintiff learned the Cargo was "substantially more damaged" than Defendant had represented and contained debris. *Id.* at 12, ¶ 65. Plaintiff had to refund a portion of the purchase price to the buyer, and its reputation with the buyer was damaged. *Id.* at 12, ¶ 66. Plaintiff was unaware of the full extent of the damage to the Cargo before the buyer refused delivery, and Defendant did not inform Plaintiff of the damage. *Id.* at 13–14, ¶¶ 75–76.

Plaintiff lost revenue as a result of the damage to the Cargo, and over 1,800 metric tons of Plaintiff's corn was never recovered from Defendant's facility. *Id.* at 12, ¶ 67. Furthermore,

almost 375 metric tons of Plaintiff's corn was so damaged it needed to be destroyed. *Id.* at 12, ¶ 68. From June 2017 through February 2018, Defendant charged Plaintiff approximately $1,987,163.48 for storage, handling, loading/unloading, and overtime without considering the damage to the Cargo. *Id.* at 13, ¶ 74. On August 24, 2018, Defendant charged Plaintiff for storage and disposal fees for the remaining damaged Cargo that Plaintiff was unaware Defendant still retained. *Id.* at 14–15, ¶¶ 78, 80, 85. Plaintiff's financial losses are attributable to lost revenue, storage and related fees, vessel demurrage fees, and refunds to buyers; by Plaintiff's calculations, these losses total $4,152,654.20. *Id.* at 17, ¶ 96.

## PROCEDURAL BACKGROUND

On April 26, 2019, Plaintiff filed this lawsuit against Defendant, seeking compensatory and punitive damages exceeding $3,500,000. ECF No. 1.[1] On June 7, 2019, Defendants filed a Motion to Dismiss for failure to state a claim as to all but Count I of the Complaint. ECF No. 19. On June 21, 2019, Plaintiff filed a response in opposition (ECF No. 20), to which Defendant replied on July 5, 2019. ECF No. 21. On July 23, 2019, this Court entered a Memorandum Opinion and Order granting in part and denying in part Defendant's Motion to Dismiss with leave for Plaintiff to amend. ECF Nos. 23, 24.

On August 22, 2019, Plaintiff filed an Amended Complaint. ECF No. 31. On September 5, 2019, Defendants filed a Motion to Dismiss Counts IV, V, and VI of the Amended Complaint (ECF No. 33) and an Answer to the remaining Counts. ECF No. 34. Included in its Answer, Defendant filed a Counterclaim against Plaintiff seeking the recovery of monies owed for services rendered to Plaintiff. On September 19, 2019, Plaintiff opposed the Motion to Dismiss (ECF No.

---

[1] On September 30, 2019, in accordance with Standing Order 2019-07 of the United States District Court for the District of Maryland and upon consent of all parties, this case was directly assigned to United States Magistrate Judge A. David Copperthite for all proceedings.

37), and on October 17, 2019, Defendant filed a reply. ECF No. 41. On November 12, 2019, this Court entered a Memorandum Opinion and Order denying Defendant's Motion to Dismiss Counts IV, V, and VI of the Amended Complaint. ECF No. 43, 43.

On May 6, 2021 Defendant then filed a Motion for Summary Judgment. ECF No. 94. Plaintiff filed a response in opposition and Cross-Motion for Summary Judgment on May 20, 2021. ECF No. 100. On June 3, 2021, Defendant filed reply and opposition to Plaintiff's cross-motion. ECF No. 101. On June 17, 2021, Plaintiff filed its reply in support of its Cross-Motion for Summary Judgment. ECF No. 103. Accordingly, the Motion for Summary Judgment and Cross-Motion for Summary Judgment are fully briefed.

## DISCUSSION

### A. Standard of Review for Defendant's Motion for Summary Judgment

Pursuant to Rule 56, a movant is entitled to summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Supreme Court has clarified that not every factual dispute will defeat a motion for summary judgment but rather, there must be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphases in original)). An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome. *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330

(4th Cir. 2012). On the other hand, if after the court has drawn all reasonable inferences in favor of the nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

The party seeking summary judgment bears the initial burden of either establishing that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex Corp.*, 477 U.S. at 322–24. Once the movant has met its burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In order to meet this burden, the non-movant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). As noted, a genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 249). Thus, "to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Moss v. Parks Corp.*, 985 F.2d 736, 738 (4th Cir. 1993) (quoting *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990)).

### B. Defendant's Motion for Summary Judgment

In its Motion, Defendant seeks a summary judgment ruling in its favor on all claims raised in Plaintiff's Amended Complaint. Plaintiff argues that Defendant "has not shown undisputed facts

that could possibly entitle it to judgment...as a matter of law." ECF No. 100-1 at 6. The Court agrees with Plaintiff. Genuine disputes of material fact exist and therefore summary judgment is inappropriate. Accordingly, Defendant's Motion is DENIED for the reasons set forth below.

I. The Contract.

Defendant's first argument is that Plaintiff's claims are barred by a contractual clause limiting liability. According to Defendant, "the undisputed record reflects that both Global Natural and [Plaintiff] entered into signed written contracts with [Defendant] for the services concerning the [Cargo]." ECF No. 94-1 at 23. Defendant states that these signed contracts expressly provide and incorporate the following terms and conditions, "[a] one (1) year time for suit provision, €100,000 limitation of liability, that '[Defendant] does not accept any liability for contamination or quality of the cargo,' and risk allocation provisions wherein [Plaintiff] was contractually obligated to procure and maintain first-party insurance for the Grain." *Id.* In support of its claim, Defendant raises a series of arguments for why the limited liability clause is enforceable against Plaintiff. However, genuine disputes of material fact exist surrounding each of Defendant's allegations, rendering summary judgment unavailable.

First Defendant argues that the limited liability clause is enforceable because Plaintiff entered into a contractual agreement with Defendant and is thus "bound to the signed written contract's terms and conditions." ECF No. 94-1 at 4. Defendant points to the fact that on July 18, 2017, Plaintiff's CFO, Darla Turner, "signed the written contract with [Defendant]." *Id.* Though the record indicates Plaintiff reached out to Defendant with concerns regarding the disclaimer of liability, Defendant states that Plaintiff "nevertheless agreed to all of [Defendant's] terms and continued to accept its services under the terms of the contract." *Id.* According to Defendant, Plaintiff therefore "is bound to the terms of the contract and cannot dispute its binding effects." *Id.* at 26.

Plaintiff argues that the July 18, 2017 contract is not enforceable for multiple reasons. Plaintiff asserts first that the liability terms cannot be enforced because the signed agreement did not pertain to the storage of the Cargo, only its loading onto the Thor Endeavor. ECF No. 100-1 at 20. Next, that Defendant breached its agreement to store and handle the Cargo "in a manner consistent with industry standards" thus rendering the contract unenforceable. *Id.* And lastly, that the July 18 proposal cannot be enforced because Defendant "fraudulently induced [Plaintiff] to sign it." *Id.*

In order to grant a party's motion for summary judgment, "the party seeking summary judgment bears the initial burden of either establishing that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent." *Celotex Corp.*, 477 U.S. at 322–24. Here, it is evident that a genuine dispute of material fact exists around whether the July 18, 2017 contract proposal is enforceable against Plaintiff. Plaintiff's first argument raises a contract interpretation question. Contract interpretation is a question of law. *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163 (2003) (citations omitted). Maryland follows the objective approach to contract interpretation. *Hyperheal Hyperbarics, Inc. v. Shapiro*, 404 F.Supp.3d 953, 965 (D.Md.2019) (citations omitted). Under the objective test, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." *Id.* (citations omitted). If the language of the contract is clear and unambiguous, the court will give effect to its plain, ordinary, and usual meaning, considering the context in which it is used. *Id.* (citations omitted). "[T]he true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Ocean Petroleum, Co., Inc. v. Yanek*, 416 Md. 74, 85 (2010) (citation omitted).

11

Plaintiff signed the July 18 proposal, "[u]nderstanding that the proposal's express terms covered the loading of the [Cargo] and not [Defendant's] storage responsibilities." ECF No. 100-1 at 13. In this instance, the Court interprets the terms of a contract irrespective of the parties' intent. *Ocean Petroleum, Co.*, at 85. Here, a reasonable objective interpretation of the July 18, contract proposal results in the determination that Defendant was contractually responsible to Plaintiff for storing the Cargo beginning July 1, 2017. ECF No. 94-5 at 61. The subject of the proposal reads: "Re: Loading Bulk Grain from Access World (Sparrow point) Bunker Silo into MV Thor Endeavor or substitute loading within the month of July 2017" and in the "Services" box is a quote for "Storage July 1—date of loading." *Id.*

Plaintiff also asserts that Defendant cannot enforce the terms of its contract because it breached its agreement with Plaintiff when, "during the loading of the grain onto the MV Thor Endeavor, it failed to store and handle the grain in a manner consistent with industry standards." ECF No. 100-1 at 20. This too raises issues of material fact because a dispute exists regarding Defendant's procedure and means of storing grain and whether the means of storage were known and consented to.

According to Plaintiff, Defendant "failed to properly aerate the [Cargo] until... nearly two months after the [Cargo] was first offloaded into the storage bins." ECF No. 100-1 at 17. Plaintiff also asserts that "on August 17, 2017, [Defendant] repeatedly represented to [Plaintiff] that it was covering [the Cargo] to protect it from further damage when, in reality, it was not." ECF No. 100-1 at 28 (record citations omitted). Defendant disagrees and maintains that the Cargo was not without aeration between May 1 and May 24. In fact, Defendant states that the Cargo "was not in the bunker silos during the entirety of the period during which the aeration fans were not operating. Instead, the grain remained on the vessel. Moreover... [the parties] understood that the bunker

silos would be constructed simultaneously with the discharging of the Grain" and "approved the manner in which the [Cargo] was stored" after a site visit to the location. ECF No. 94-1 at 12, No. 101 at 21.

Clearly questions of material facts remain surrounding whether the scope of the July 18 agreement can extend beyond the four corners of the document and if so, whether Defendant is shielded from liability for the alleged damage that occurred during the storage of the Cargo prior to July 1. There are also clear disputes of fact surrounding Defendant's storage methods and Plaintiff's knowledge of these methods. As such, these questions render the issues inappropriate for summary judgment.

Defendant argues that it should be granted summary judgment because Plaintiff is a third-party beneficiary to the contracts between Global Natural and Defendant making it "subject to the limitations and exculpations of liability" in those contracts. ECF No. 94-1 at 28. Plaintiff's arguments against this allegation also raise disputes of material fact. Therefore, Defendant is not entitled to summary judgment.

Both parties agree that Plaintiff is a third-party beneficiary to the contracts between Global Natural and Defendant. However, Plaintiff contends that it is not subject to the terms and conditions of those contracts because Defendant "breached its fundamental obligation to store [the Cargo] under any reasonable standard of care" and because Defendant fraudulently induced Global Natural to enter into those agreements. ECF No. 100-1 at 17, 18. Plaintiff presents evidence of factual disputes including whether those contracts are enforceable against Plaintiff. Whether Defendant stored the Cargo under a reasonable standard of care is also disputed, even beginning with the initial storage date.

13

Plaintiff states that the discharge of the Cargo was completed on April 15, 2017 (ECF No. 100-1 at 9) while Defendant contends that it was not completed until May 1, 2017. ECF No. 94-1 at 13. During this time, Plaintiff claims that Defendant "failed to properly aerate the [Cargo] until... nearly two months after the [Cargo] was first offloaded into the storage bins." ECF No. 100-1 at 17. As previously noted, Defendant asserts that the Cargo was not without aeration between May 1 and May 24 and the Cargo was not in the bunker silos during this entire period and that Global Natural knew and understood that the bunker silos discussed would be constructed simultaneously with the discharging of the Cargo. ECF No. 94-1 at 12.

Further, Plaintiff argues that Defendant's "assurance that it would store the [Cargo] in properly covered and aerated bunker silos was a false statement of material fact made for the purpose of inducing Global Natural to enter into an agreement with [Defendant] for [Defendant] to store the [Cargo]." Defendant contends, however, that Global Natural "understood that the bunker silos would be constructed simultaneously with the discharging of the [Cargo]" and agreed to the other means of storage. ECF No. 94-1 at 12. Plaintiff disagrees, stating Global Natural never knew about "let alone consented to, the haphazard, unprotected fashion in which [Defendant] stored the [Cargo]." ECF No. 100-1 at 18. Defendant maintains that in-fact, according to testimony, Global Natural "approved of the manner in which the [Cargo] was stored" after a site visit to the location. ECF No. 101 at 21.

Global Natural's knowledge, or lack thereof, is material to whether Defendant fraudulently induced Global Natural into entering the agreements. There are genuine disputes of material fact related to what Global Natural knew and whether it agreed to the manner in which the Cargo was stored. Since there is clearly a factual dispute as to this issue, summary judgment must be denied.

14

Defendant also argues that through prior course of dealings between Global Natural and Plaintiff, Plaintiff is bound by the terms and conditions limiting Defendant's liability. Defendant claims that the issuance of eleven invoices to Global Natural and sixty-two invoices to Plaintiff for services rendered concerning the Cargo, as well as the multiple emails between all parties amounts to a prior course of dealing. ECF No. 94-1 at 29. According to Defendant, because all emails and invoices include a signature referencing the terms and conditions, Plaintiff therefore agreed and is subjected to them. *Id.* The Court disagrees with this argument.

The Fourth Circuit has held that communications such as the exchange of purchase orders and acknowledgements between parties do not contractually bind the two. *Roanoke Cement Co., LLC v. Falk Corp.*, 413 F.3d. 431, 433 (4th Cir.2005). In *Roanoke Cement Co., LLC v. Falk Corp.*, Roanoke Cement Company L.L.C., utilized Falk Corporation as a subcontractor to design and build a "ball mill." *Id.* at 432. Faulk received a purchase order containing the technical specifications for the build, the delivery date and price of materials, and a clause which stated that the acceptance of the purchase order meant they accepted the included terms and conditions. *Id.* One of the terms and conditions in the purchase order was an indemnification clause, holding Roanoke "harmless from any and all claims, liabilities, damages, losses, settlements, and expenses [for] loss of or damage to property in connection with the materials furnished hereunder." *Id.* After accepting the purchase order, Faulk entered into a written contract with Roanoke, raising the issue of whether the indemnity provision from the purchase order was enforceable against Faulk. The court found that it was not, because it was "evident that [Faulk] never manifested an intention to be bound by the provisions set forth in the purchase order." *Id.* at 434. The court also held that "in light of the parties' admission that a contract existed, the indemnification provision of the purchase order effectively falls away." *Id.* at 435 (internal citation omitted).

15

The facts in this matter are similar to those in *Roanoke Cement*. Here, the parties agree that they entered into a written contract on July 18, 2017. The record indicates that the parties did not manifest an intent to be bound by the terms included in Defendant's email signature and invoices. The parties admit they entered into a written contract on July 18, 2017 therefore, like in *Roanoke Cement*, the liability provisions and other terms included in the emails and invoices are not binding. Accordingly, the Court finds that there is no basis for summary judgment on this issue.

Defendant further argues that the terms of the contracts entered into between Global Natural, Plaintiff, and Defendant are enforceable against Plaintiff, making the action time barred and/or monetarily limiting Plaintiff's recovery. Defendant claims that Plaintiff's action is time barred because Plaintiff learned of damage to the Cargo "as early as June 9, 2017" and "failed to file the instant lawsuit against [Defendant] until April 26, 2019, over twenty (20) months after the three (3) Letters of Protest and re-exportation of the [Cargo]." ECF No. 94-1 at 31 (record citations omitted). Defendant asserts that this Court and the Fourth Circuit "have recognize[d] contract limitations of liability and terms barring the recovery of consequential damages." ECF No. 94-1 at 32 (citing *Nixon Uniform Service, Inc. v. American Directory Service Agency, Inc.*, 693 F.Supp. 367, 368 (D.Md. 1988).

While it is true that this Court recognizes contractual liability limitations, Defendant's argument here fails because when Plaintiff learned of the damage to the Cargo is a genuine dispute of material fact. Defendant maintains that according to testimony from a prior lawsuit, Plaintiff was aware that the Cargo had been exposed to moisture and damaged after a meeting on June 9, 2017. ECF No. 94-1 at 31 fn. 14. Plaintiff disagrees, asserting that "[i]t is undisputed that [Defendant] never communicated the extent of the damage of the [Cargo] to [Plaintiff] at any point while the [Cargo] was in its custody." ECF No. 100-1 at 29 (record citations omitted). In a

deposition, witness Anderson said that "sometime in July [2017] [Plaintiff] learned how damaged the cargo was during the care of [Defendant]." ECF No. 94-7 at 23. Plaintiff also rejects Defendant's allegation because its "knowledge of the condition of the [Cargo] was limited" as Defendant maintained "sole possession, custody and control" of the Cargo at its Sparrows Point facility. ECF No. 100-1 at 27. Defendant actually acknowledges this factual conflict in its Motion. Defendant claims that Plaintiff new about the damage on June 9 but continues with the statement that this fact "directly contradicts witness Anderson's testimony that [Plaintiff] did not learn of the damage to the [Cargo] until July 2017." ECF No. 94-1 at 31 fn. 14.

Defendant also cannot assert the €100,000 damages cap against Plaintiff. As discussed, whether the terms of the contracts between Plaintiff and Defendant are enforceable remains in dispute and it is inappropriate for summary judgment.

II. <u>The Condition of the Cargo.</u>

Defendant next asserts that the Court should grant summary judgment on its behalf because Plaintiff "cannot establish a prima facie case of good order and condition" of the Cargo. ECF No. 94-1 at 33. This claim cannot be decided at the summary judgment stage.

Defendant asserts that "there is no evidence of the condition of the [Cargo] at origin." ECF No. 94-1 at 34. Plaintiff disagrees, stating that the SGS reports demonstrate that the Cargo was in good condition upon its arrival. Plaintiff cites to numerous exhibits containing various SGS reports documenting the condition of the Cargo upon inspection. ECF No. 100-1 at 26. The record shows that the reports describe the Cargo as "dry, and free flowing with no visible damage or objectionable odors observed that would compromise the quality of the cargo" and include numerous pictures documenting the appearance of the Cargo. ECF No. 100-12. Defendant maintains however, that "there are absolutely no records or photographs of the samples taken from

17

the vessel." ECF No. 94-1 at 35, No. 101 at 12. Clearly the condition of the Cargo as well as the evidence available are in dispute, thus requiring a denial of summary judgment.

III. <u>Ownership of the Cargo.</u>

Defendant's final basis for summary judgment is that Plaintiff is not the true owner of the Cargo and thus cannot "advance a cognizable theory as Plaintiff." ECF No. 94-1 at 39. While Defendant argues that Plaintiff is not the proper owner of the Cargo, Plaintiff disagrees, citing to multiple invoices as evidence of ownership. ECF No. 100-1 at 30 (citing to Exs. 1-7). Defendant maintains that "the record reflects that [Plaintiff] was not the owner of the [Cargo] and it has never produced a single shred of evidence or testimony to the contrary." ECF No. 94-1 at 39-40. Plaintiff however, states that "the record in discovery overwhelmingly demonstrates that [Plaintiff] owned the [Cargo]." ECF No. 100-1 at 30. Additionally, Plaintiff claims that "the record also reflects that [Defendant] knew [Plaintiff] owned the [Cargo]." *Id.* (citing to Ex. 8). Once again, there is clearly a dispute of material fact as to whether Plaintiff owned the Cargo, requiring the denial of summary judgment.

**C. Defendant's Counterclaim/Plaintiff's Cross-Motion for Summary Judgment**

Defendant filed a counterclaim against Plaintiff alleging breach of contract, unjust enrichment, and that Plaintiff owes Defendant "monies in excess of a total invoice amount of $301, 527.26." ECF No. 34 at 15-16. Defendant contends that Plaintiff breached its contract and claims unjust enrichment because Plaintiff failed to pay Defendant the sum noted above for services rendered.

Plaintiff argues that summary judgment should be granted in its favor because Defendant "breached its agreement with [Plaintiff], and it may not now seek to enforce [Plaintiff]s] performance of provisions of that agreement, including any payment by [Plaintiff]." ECF No. 100-

1 at 31. However, as set forth above disputes of material fact exist surrounding Plaintiff's basis for summary judgment. Here there are conflicting facts regarding what the terms of the contract were and whether there was a breach at all. Therefore, Plaintiff's cross-motion for summary judgment (ECF No. 100-1) must be DENIED.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court finds that, as to Defendant's Motion, genuine disputes of material fact exist. Therefore, Defendant's Motion for Summary Judgment (ECF No. 94) is DENIED. Additionally, for the same reason, Plaintiff's cross-motion for summary judgment (ECF No. 100-1) is DENIED. A separate order will follow.

Date: 14 July 2024

A. David Copperthite
United States Magistrate Judge